E8TFBASS                          Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              13 CR 340 (RJS)

5    STEPHEN BASCIANO,

6              Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           August 29, 2014
9                                          2:00 p.m.

10

     Before:
11
                     HON. RICHARD J. SULLIVAN,
12
                                           District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     REBECCA MERMELSTEIN
17        Assistant United States Attorney

18   JOSHUA DRATEL, ESQ.
          Attorney for Defendant
19

20

21

22

23

24

25

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  United States v. Stephen Basciano.

4     Counsel, please state your appearances for the record.

5          MS. MERMELSTEIN:  Good afternoon, your Honor.  Rebecca

6     Mermelstein for the government.

7          THE COURT:  Ms. Mermelstein, good afternoon to you.

8     And for the defendant?

9          MR. DRATEL:  Good afternoon, your Honor.  Joshua

10    Dratel for Mr. Basciano who is beside me.

11         THE COURT:  Good afternoon, Mr. Dratel.  Mr. Basciano,

12    good afternoon as well.  And family and friends are here.  I

13    recognize a few of them from before.  Welcome.  This is public

14    so everybody is welcome here.  Some of you have written me

15    letters.  It's very helpful to get letters of that sort.

16         We're here for sentencing.  Mr. Basciano pled guilty

17    before me on February 19.  I want to go over with the parties

18    what I have received in connection with sentencing and of

19    course if I have left anything out you should let me know.

20         I have reviewed, first of all, the transcripts of the

21    guilty plea proceeding that took place on February 19.  I

22    presided over the proceedings so I was here, but I think it's a

23    good practice to review them before sentencing, so I've done

24    that.  I also have reviewed the presentence report that was

25    prepared by the probation department.  It's dated July 2.  The

1    report itself is 25 pages single spaced, it includes a

2    sentencing recommendation.  I have reviewed that.

3             I have reviewed the government's sentencing letter

4    dated June 23rd, which is a six-page letter, single spaced.  I

5    have reviewed Mr. Dratel's June 25th sentencing submission.  It

6    is a 24-page, single-spaced submission and it includes assorted

7    attachments all of which are letters from friends and family

8    members as I mentioned before.  I have reviewed a July 7 letter

9    from Mr. Dratel which is one sentence long.  It just attaches

10   the original signed versions of letters that were included in

11   the prior submission.  So I have that.  That didn't really add

12   anything but it's good to have the signed originals.  And then

13   I have reviewed also the August 25th submission of Mr. Dratel

14   which is a four-page, single-spaced submission that also

15   includes a letter from Mr. Basciano which is two pages, single

16   spaced, handwritten, very well written, I should say, for which

17   I thank you, Mr. Basciano.  You didn't have to do that, but I

18   thank you, it was thoughtful.

19            THE DEFENDANT:  Thank you.

20            THE COURT:  That's what I have received in connection

21   with sentencing.  Am I missing anything?

22            MS. MERMELSTEIN:  No, your Honor.

23            MR. DRATEL:  No, your Honor.

24            THE COURT:  Let's start with the presentence report.

25   Mr. Dratel, you received a copy of the presentence report?

1                MR. DRATEL:  Yes, your Honor.

2                THE COURT:  Have you reviewed it with your client?

3                MR. DRATEL:  Yes.

4                THE COURT:  Do you have any objections to it?

5                MR. DRATEL:  We stated some objections in our letter

6     and the final report incorporates some changes.  I don't know

7     if they change any procedural aspects with respect to guideline

8     levels except with respect to 2D1.1 which was prior to the

9     Sentencing Commission's decision on retroactivity.  According

10    to the report it doesn't address the 2D1.1.

11               THE COURT:  I'm not sure the Probation Department's

12    position is going to change or has changed as a result of the

13    retroactivity.  The Sentencing Commission has recommended

14    certain amendments.  They've also voted to make those

15    amendments apply retroactively.  Neither goes into effect

16    unless and until Congress acts through inactivity.  It's sort

17    of a perverse thing.  Congress has between now and November to

18    decide whether to take steps to affirmatively reject the

19    proposals.  If they do nothing, then the amendments go into

20    effect and that would result in a two-level reduction.

21               The United States Attorney's Office has typically

22    taken the position that the two levels should apply now, that

23    he shouldn't have to wait, unless there are certain aggravating

24    circumstances and in the sentencings of other defendants in

25    this case the government has taken the view that the two-level

1    reduction shouldn't be applied because the defendants have ties

2    to organized crime.  I think the government no longer has that

3    position.  In light of the retroactivity, in light of some

4    additional discussions within the Department of Justice they

5    are no longer taking that position.  They are now consistently

6    across the board taking the position that the drug guidelines

7    should be reduced by two levels.

8          Is that accurate here, Ms. Mermelstein?

9          MS. MERMELSTEIN:  That's correct, your Honor, I put in

10   my submission before the government changed its position but

11   you're exactly right.

12         THE COURT:  I'm getting ahead of myself here, I

13   suppose.  My only view is, frankly, we should wait for

14   amendments to go into effect before we apply them, but because

15   many judges including myself in other cases have applied the

16   lower guidelines in anticipation of the amendment, I don't

17   think there's any reason to not do the same here.  So I'm going

18   to apply the two-level reduction.  So that I think is off the

19   table.  The other objections that you had were with respect to

20   characterizations of facts in prior arrests that you dispute.

21   Probation stands behind the facts that they had.  I don't think

22   it's going to affect the sentencing at all.  We could perhaps

23   talk about that as well.  I'm allowed to consider facts that

24   took place even if they weren't proven in other cases, proven

25   beyond a reasonable doubt, but it may be that I would have to

E8TFBASS                          Sentence

1    make a factual finding that they were established by a

2    preponderance of the evidence, if I apply that here.  I don't

3    think we have to do that here but we'll cross that bridge when

4    we come to it.  Other than that, you have no objections?

5              MR. DRATEL:  No, your Honor.

6              THE COURT:  Ms. Mermelstein, you reviewed the report.

7    Do you have any objections?

8              MS. MERMELSTEIN:  No, your Honor.

9              THE COURT:  Okay.  All right.  So that's the

10   presentence report.  Mr. Basciano, when you pled guilty I told

11   you there were different factors that the judge had to take

12   into account in deciding sentence.  Do you recall that?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  One of the factors I mentioned was the

15   United States sentencing guidelines that we spoke about a

16   little bit today.  Remember this big book?

17             THE DEFENDANT:  Yes.

18             THE COURT:  I think I pointed that out to you and you

19   and some of the others who were there on that day remember that

20   this is a book that some judges and lawyers and academicians

21   put together and what it does is provide guidance to judges

22   like me.  Judges are to look at this book, go to pages that

23   apply, make findings of facts and certain conclusions based on

24   that.  For every crime and type of crime there's a chapter in

25   this book.  So the judge is required to go to that chapter.  So

1  in this case which relates to a narcotics offense the judge is

2  required to go to Section 2D1.1 in this manual and make

3  findings including the type of drug involved, amount of drug

4  involved, those sorts of things.  The judge has to look up

5  certain things that relate to role in the offense and some

6  other things and through that process of addition and

7  subtraction the judge comes up with a number and that number is

8  known as the offense level.  The judge then goes to another

9  chapter in the book that relates to criminal history and for

10  that chapter the judge is asked to consider whether the

11  defendant has prior convictions, if so, did it result in jail

12  sentences, if so, what were those sentences and depending on

13  the answers to those questions the judge assigns points and

14  comes up with another number, that number being referred to as

15  the criminal history category.  There are six categories.

16  Category I is the lowest, category IV is the highest and most

17  serious.  The judge is then told to take those two numbers, the

18  offense level on the one hand, the criminal history category on

19  the other, and go in the back of in book where there's a table

20  or rating and the judge goes down this table to the far left,

21  offense level, stops at the one appropriate.  The judge goes

22  across the other columns to the right, stops at the column

23  that's appropriate for criminal history category and what the

24  judge finds is the range that the commission recommends.

25              I don't have to follow this.  I do have to consider

1    it.  I have to make my findings according to the book and state

2    what the range is but there are other factors I have to

3    consider as well.  So we're going to spend a few minutes

4    talking about this book and how it applies in this case.  Once

5    I do that, state the range, then we'll talk about the other

6    factors.

7            I apologize for the acoustics.  We have some new

8    microphones.  It's a beautiful courtroom.  The acoustics are

9    challenging, so we have new microphones.  They were designed to

10   enhance the ability to be heard.  They're working okay, but

11   every once in a while we get some feedback which kinds of makes

12   you feel like a dog hearing a whistle, so it's irritating, but

13   we'll deal with that as we go.

14           So for the sentencing guidelines the presentence

15   report sets forth the views of the probation office beginning

16   on the very bottom of page 9, but for the most part on page 10

17   through page 12.  The base offense level based on the amount

18   and type of drugs, which is marijuana, at least 80 kilograms,

19   not more than 100 kilograms, is level 24.  Now, I recall

20   certainly at the time of the guilty plea there was some dispute

21   as to what the amount of marijuana was.  Mr. Basciano at least

22   initially thought it was less than a hundred kilos but wasn't

23   really sure, so I just want to be sure everyone is on board

24   that this is the quantity, 80 to 100 kilograms?

25           MR. DRATEL:  Yes.

E8TFBASS                        Sentence

1           THE COURT:  And the government is?

2           MS. MERMELSTEIN:  Yes, your Honor.

3           THE COURT:  So I have no reason to dispute that so I

4    will adopt that finding.  Level 24 is the base offense level.

5           Mr. Basciano, there's no enhancements.  There's a

6    three-level reduction because you accepted responsibility and

7    accepted, pled guilty well in advance of trial so pursuant to

8    Section 3E1.1 a three-level reduction is appropriate.  That

9    puts him at level 21.  Mr. Basciano is in criminal history

10   category III.  He has three prior convictions; one for assault,

11   two for aggravated unlicensed operation of a motor vehicle.  I

12   guess he was also on parole at the time of this offense, so

13   that results in a total of six criminal history points,

14   criminal history category III.  So offense level 21, criminal

15   history category III puts the range at 46 to 57 which is what

16   the probation department found.

17          By virtue of the amendment that has not yet taken

18   place, not gone into effect yet but is likely to, in which the

19   government and the defense lawyers and other lawyers assume to

20   be going through, I'm going to reduce by another two levels the

21   offense level.  So that puts us at level 19, criminal history

22   category III, which is a guidelines range of 37 to 46 months.

23   It's an odd number.  That's three years and one month up to

24   three years and eight months.  So that's the range.  I think

25   somebody in the submission had suggested that it was 36 months

1  at the bottom end, but it says 37.

2          MR. DRATEL:  37.

3          THE COURT:  37.  Okay.  So that's my finding with

4  respect to the sentencing guidelines.  Does anybody object to

5  what I just said?

6          MR. DRATEL:  No, your Honor.

7          MS. MERMELSTEIN:  No.

8          THE COURT:  Okay.  So, as I said, there's no magic to

9  the guidelines.  That's one thing you think about.  Do you need

10  a minute?

11          MR. DRATEL:  Just one second, your Honor.

12          (Pause)

13          MR. DRATEL:  Thank you, your Honor.

14          THE COURT:  Okay.  So there are other factors,

15  Mr. Basciano, that I mentioned to you before you pled guilty

16  and these are factors that a Court has to consider along with

17  the guidelines in fashioning sentence.  Those factors include

18  your own personal history, the facts and circumstances of your

19  life and your birth to the present, which like everybody's life

20  is complicated.  There are a lot of different things that have

21  gone on in your life and they're all relevant to figuring out

22  what's the appropriate sentence.  I have to tailor the sentence

23  here to you as a person and that means considering the

24  circumstances of your birth, your early childhood, your

25  educational background, your work history, your criminal

1    history to be sure.  Other factors like family circumstances

2    today.  So I will consider all those things, naturally.

3           I also have to consider the facts and circumstances of

4    this crime.  This is a serious crime, obviously.  And the

5    sentence that I impose has to reflect the seriousness of the

6    crime.  It has to be a just punishment for the crime.  And that

7    means not just what the crime is called but what the crime

8    entailed, what you did, what others did, for how long a period

9    of time, for what kind of money, with what kind of effect.

10   Those are all relevant factors to be considered in fashioning,

11   in tailoring the sentence.  The sentence is designed to promote

12   respect for the law and that requires a balancing.  Other

13   factors that I'm required to consider include the need to deter

14   or discourage you and others from committing crimes in the

15   future, the hope being that by imposing a sentence on you I'll

16   send a message to you and perhaps to other people who might be

17   considering engaging in criminal conduct in the future and

18   hopefully on the basis of this sentence they'll say, oh, it's

19   not worth it, forget it and at the end of the day there will be

20   less crime than there would have been had I sentenced you to a

21   lower sentence.  Hard to know with any precision whether that's

22   true, but that's the thinking and I think most of us know

23   there's something to it.  So that's a factor I have to take

24   into account.

25           I also have to consider your own needs while you're in

E8TFBASS                          Sentence

1  custody.  People with medical conditions, mental health

2  conditions, substance abuse treatment needs, all of those

3  things have to be considered by the judge in fashioning a

4  sentence.  And then I guess the last factor that I'm required

5  to consider and will consider is the need to avoid what's

6  referred to as unwarranted disparity between the sentence in

7  this case and other similar cases for a similar offense and the

8  point is it would be wrong and probably would encourage less

9  respect for the law if the sentence imposed here was wildly out

10  of whack with sentences imposed on other defendants in cases

11  that are similar to this one with histories that are similar to

12  the defendant here.  It's important that there be some rough

13  equality across the system so that the system is perceived as

14  unbiased, so I'll consider that.  The hard part is balancing

15  all these factors and that's my job in a nutshell.

16          What I'm going to do is hear from the lawyers.  I'll

17  start with Mr. Dratel.  He's made a variety of points in his

18  submission which was very lengthy, very characteristic of him.

19  So I'll hear from Mr. Dratel on those and other points he

20  wishes to make.

21          I'll hear from Ms. Mermelstein.  I'll let her respond

22  and make other points she thinks are relevant.  After that I'll

23  give you the opportunity to speak, if you'd like.  You have the

24  opportunity to speak.  You've already written me a letter.  You

25  shouldn't feel you have to speak but if you'd like to you're

1    very welcome to and after that I will then tell you the

2    sentence I will impose and my reasons for it.  So, Mr. Dratel?

3              MR. DRATEL:  Thank you, your Honor.  And I won't go

4    through all of the points that are in the submissions.  I know

5    the Court has read them and is considering them.  The Court's

6    initial remarks obviate the need for me to talk about the

7    amendments.  I'd like to speak about the letters from some of

8    the people who are here, some people who are not here, but

9    obviously it's a show of support for Mr. Basciano in terms of

10   what the future holds for him in the sense of someone who when

11   he does emerge from jail will have a support mechanism that

12   obviously cares about him, cares about his future and from his

13   letter the Court knows his family's view of the situation he's

14   in, what got him here and where he will be once this is

15   finished.  So I think that's important in the context of

16   projecting into the future for particular defendants as to what

17   their current sentence is going to mean once it's expired.  I

18   think Mr. Basciano's letter is very important, obviously in the

19   context of where he sees himself now, where he sees the conduct

20   that put him here and where he says himself in the future.  So

21   much of this process in a certain sense, bears repetition, in

22   case after case it's choreographed in a sense, but his letter

23   is not.  It's his own, generated by him and him alone and it

24   reflects his sincere position on where he's at and where he was

25   at the time of his arrest.

1              I want to talk a little bit about criminal history

2      because we talked about it a little bit in the papers but I

3      want to expand on it in this sense in that a couple of mistakes

4      that Mr. Basciano has made in the past and for which he has

5      paid for with jail time continue to exert a significant impact

6      on where he is in the guidelines in this case.  And I think at

7      some point that's been taken into account so it doesn't

8      continually again and again result in punishment for something

9      that he's already served a prison sentence for and something

10     that just, there's no escape from, but at the same time I think

11     it has to be factored in also particularly the kind of offense,

12     the driving without a license, the 30-day sentence that puts

13     him in category 3.  I think the parole issue is also a

14     technical one because it really relates to the length of the

15     indictment going back to 2009.

16             THE COURT:  I'm not sure that's what puts him in

17     category III.  In category III, he has three levels because of

18     the assault and that's a pretty serious crime.  He did some

19     jail time for that one.

20             MR. DRATEL:  Yes.

21             THE COURT:  He got two more points because he was on

22     parole at the time he was involved in this criminal activity,

23     so even without the driving offense he's in, he's got five

24     criminal history points which puts him in category III.

25             MR. DRATEL:  But I think the parole one is a technical

1    issue as well because even though the conspiracy starts in

2    2009, the plea agreement -- because the presentence report went

3    by the indictment which alleges from 2009 but the plea

4    agreement discusses his participation from 2012 on and he's off

5    supervision in 2011.  So I think that's a technical issue which

6    is one that again ameliorates or mitigates the criminal history

7    category which is a technical matter either way.

8              THE COURT:  I'm not sure of the facts then.  Paragraph

9    26 of the presentence report talks about, "Stephen Basciano

10   started Vincent Basciano's, Jr.'s marijuana route and sold the

11   route to Vincent Basciano, Jr. while he was in jail in

12   connection with a 2007 conviction for assault.  Vincent

13   Basciano, Jr. started operating the route in at least 2009 and

14   paid Stephen Basciano a portion of the proceeds from the route.

15   After Stephen Basciano got out of jail in 2009 he started

16   selling marijuana a pound at a time to other customers.  He

17   purchased marijuana from Larca that Larca obtained from the

18   marijuana shipments arranged by others."  So according to

19   paragraph 26 the activity doesn't begin in 2012, it begins in

20   2009.

21             MR. DRATEL:  Right.  That's what the indictment

22   charges, your Honor.

23             THE COURT:  So I don't know it's technical.  I'm not

24   sure I'm following the point you're making.

25             MR. DRATEL:  Just that his plea was between, started

E8TFBASS                    Sentence

1   in 2012 to 2014.  That's all -- I mean, 2013.  I'm sorry.  So

2   it's just, it gets into category III regardless, but it's just

3   an overlap that's not quite consistent in terms of the

4   allegations.  But I still think that even still that it's

5   unusual with someone with a single felony to be in category

6   III.

7           THE COURT:  Well, if you commit the crime while you're

8   on probation it's not unusual.  The instant crime.  I mean, I

9   don't know.  I guess it seems to me if you went to jail you get

10  your three points, you commit another crime shortly after you

11  get out while on probation you'll be in category III by

12  definition.  I don't think there's anything unusual about that.

13  I know the guidelines didn't contemplate exactly this kind of

14  scenario.

15          MR. DRATEL:  Another factor also is the sentencing in

16  terms of the 3553(a)(6), which is the disparity issue, the

17  Court I think in this case has for some of the defendants has

18  for the sentencings gone below the guidelines.  Certainly the

19  predominant trend in this district is below the guidelines for

20  sentences generally and nationally for drug cases below the

21  guidelines as well.  And putting all those statistics -- so I

22  think a sentence below the guidelines is really more the norm

23  by a large margin now particularly in a case like this than a

24  guideline sentence.

25          THE COURT:  You had something about that in your

1  letter.  You certainly didn't carve out cooperation, so I think

2  it's apples and oranges.  It should be for non-cooperating

3  cases what percentage fall within or outside the guidelines.

4          MR. DRATEL:  For the vast majority, if you carve them

5  out entirely it's still probably, in this district, 55 percent

6  of all sentences.  I'm trying to do the math right now.  If you

7  take out the 55 all together then you're talking about 80,

8  talking about 85 percent of the cases, about 5/8ths, so you're

9  looking at more than 60 percent would be below the guidelines

10  still even if you carved out the 15 percent cooperator cases.

11          THE COURT:  Well, there's a high percentage of them

12  below the guidelines.  I think we can agree on that.

13          MR. DRATEL:  Yes.

14          THE COURT:  All right.  But in every case it should be

15  a fact intensive and very specific inquiry about the conduct.

16  So the other defendants who have been sentenced who were part

17  of this conspiracy, there are some of them doing a lot of time.

18  Might be a little below the guidelines, but 108 months, nine

19  years, nine and a half years, eight and a half years.

20          MR. DRATEL:  But some a lot less, your Honor.  So I

21  think there's a --

22          THE COURT:  Generally that's a function I think of

23  quantity and the amount of time in the conspiracy.  Joseph

24  Basciano got a lower sentence, clearly, so did Dominick

25  Ballucia.

1          MR. DRATEL:  And Mr. Kokenyei also, I think he got a

2     sentence below the guidelines certainly.  I think his sentence

3     was three years but I think that was considerably below his

4     guidelines.

5          THE COURT:  So, all right, but the mere fact of below

6     the guidelines is less informative or instructive than what

7     those folks did in this conspiracy relative to what

8     Mr. Basciano did in the conspiracy.

9          MR. DRATEL:  Well, Mr. Kokenyei was one grade higher

10    in terms of the connection to the source.  He was the person

11    with the connection to California, I believe, so in this sense

12    Mr. Basciano is one level below that in terms of a retail

13    operation in that regard.

14         THE COURT:  Well, I'm not sure being closer to the

15    source is necessarily indicative of greater culpability.  I

16    always view it as sort of a horizontal chain as opposed to a

17    vertical one, that every link is important and without a link

18    the chain breaks.  But I don't mean, is that undisputed that

19    Mr. Kokenyei was closer to the source than Mr. Basciano,

20    Ms. Mermelstein?

21         MS. MERMELSTEIN:  I suppose it depends on what you

22    mean by closer to the source.  Kokenyei traveled to California

23    in connection with the conspiracy which this defendant didn't

24    do.

25         THE COURT:  But that's basically all the defendant

1   did.

2          MS. MERMELSTEIN:  Right, so he's a sort of middleman

3   in the chain.

4          THE COURT:  But for a very limited duration.

5          MS. MERMELSTEIN:  For a shorter period of time.  So I

6   think your Honor's point is right -- I think it's probably a

7   fair characterization to say he's closer to the source.  I'm

8   just not sure that's a useful data point in terms of

9   culpability.

10         THE COURT:  Anyway, I'm sorry to interrupt, Mr.

11  Dratel.  Go ahead.

12         MR. DRATEL:  To a certain extent all sentences are

13  apples and oranges because there are too many variables to

14  compare the entirety of one person to another.  But I think the

15  balance of everything here would militate for a sentence well

16  below the guideline that the Court has found and for all the

17  reasons that we've talked about I again, I know the Court has

18  looked at the papers, and I don't want to repeat them all but

19  there are these issues of -- also the time spent at MCC which

20  has been difficult for Mr. Basciano.  It's one of the reasons

21  he wants to be sentenced now because he wants to be somewhere

22  else other than MCC, because it's a rather difficult

23  proposition for him to be on the floor he's on because it's

24  replete with violence and just in terms of hygiene resources

25  and even ordinary resources that when one is in a prison one is

1   supposed to have available.

2          Again, I know the Court has gone through this.  I

3   think in the context of the entirety of the case where the

4   Court has sentenced people and where Mr. Basciano is and also

5   taking into account very much also his letter which again, I

6   think, is something that it's compelling in a -- I'm sorry, I'm

7   getting some feedback here, maybe if I move it this way a

8   little bit.

9          THE COURT:  Maybe.

10          MR. DRATEL:  It's compelling in the sense of where he

11  sits now in his own mind and his acknowledgment of his

12  mistakes, his recognition of what that means for himself, his

13  family, his future, and where that puts him going forward.  I

14  think that's a watershed event for someone and I think that it

15  demonstrates, again, the unnecessary, that a longer sentence is

16  unnecessary.  A guideline sentence or a sentence at or near the

17  guidelines level is unnecessary in this case, that a below

18  guidelines sentence is sufficient but not greater than

19  necessary.  Those are the factors, your Honor.

20          THE COURT:  Thank you.  Mr. Mermelstein, anything you

21  want to add or say in response to what Mr. Dratel just said?

22          MS. MERMELSTEIN:  I don't have a lot.  I think the

23  government has put forth its submissions and your Honor made

24  some of the points that I would respond to Mr. Dratel with,

25  which is to say, unlike the unlicensed operation of the motor

vehicle which I think we would say is not a very serious crime,
that is not what puts the defendant into category III, that's
not why he's in that category, and I think it is proper that he
is in this category.  And it's very significant that he is in
this category.  It's hard to see this arrest as a watershed
moment in this defendant's life because he's already served two
years in prison on his first arrest.  You would think that --
that's a relatively long prison term, certainly for a state
conviction, first offender, pretty serious prison term, and
that in no way deterred his criminal conduct.  He started this
marijuana conspiracy before that conviction and continued when
he got out of jail, while on parole, while under the
supervision of the court and continued to engage in that
criminal conduct and I think that's a basis to say two years
did not deter this defendant.  So some serious sentence is
appropriate here.  I think here the guidelines accomplish that.
To say that statistically speaking many defendants get below
guideline sentences, it can't be that as a result then for
equitable reasons no one should get a guideline sentence and I
think it depends so much on the facts of a particular case and
the facts here are disconcerting.  I think the phone calls
cited in the government's submission are also disconcerting.
Mr. Dratel reads them a different way as being a renunciation
of the prior possession of firearms and the prior willingness
to engage in violence, but, frankly, even if they're read that

1    way I think there are clearly firearms possessions by this

2    defendant for which he was never arrested and never convicted

3    and he purports to have shot at people, conduct which luckily

4    doesn't appear to have ultimately resulted in someone being hit

5    but is ultimately pretty dangerous with serious disregard for

6    the law.  So I think given the long-standing participation in

7    the offense, serious nature of the offense, his participation

8    before and after a very significant arrest I think a very

9    significant sentence is necessary and appropriate here.  I

10   think the guidelines accomplish that purpose.

11          THE COURT:  Okay.  Thank you.  Do you want to respond,

12   Mr. Dratel?

13          MR. DRATEL:  Yes.  One is that the assault occurred

14   when Mr. Basciano was 21.  He is now 30.  I think his letter to

15   the Court reflects a maturation process that was not present at

16   the time he was 21 or even when he got out of prison at that

17   point.  Although he did mature significantly in that respect

18   because what those conversations that Ms. Mermelstein refers to

19   demonstrate is the change in his point of view about firearms

20   after getting out of jail.  He specifically says more than once

21   on that tape and I've listened to them in their entirety very

22   recently.  He says it more than once, I thought that way before

23   I went to jail and it was wrong.  And he has changed and now,

24   obviously, he's got another arrest, not involving firearms or

25   anything to do with that, something else, but there's further

change.  And the question is how much more jail time is

required to get to the next level of maturation.  I think time

in and of itself has done that to a certain extent.  This is

his first time, obviously, in federal court, which I think is

significantly different in the context of people's

understanding of consequences for their acts and what the

possibilities are for future wrongdoing and how that affects

someone, and I think all of that is important in figuring out

what the appropriate sentence is, and I think that it has to be

calibrated.  The question of statistics is not one of purely

statistical analysis but it's about where the norm lies in the

context of sentencing these days, in the sense that we existed

for a significant period where the norm was the guidelines.

Now the norm is not the guidelines.  The norm is under the

guidelines.  And so I think that we have to acknowledge that

and that a sentence should reflect that in the context of

thinking about disparity, thinking about sentencing and

thinking about sufficient but not greater than necessary.

Thank you, your Honor.

            THE COURT:  Thank you.  All right, Mr. Basciano I said

you have a right to address the Court.  You don't have to --

            THE DEFENDANT:  I would like to.  Just a few short

words.  Since I've been in MCC I've had time to think.  All my

friends, vacations, everything they're doing I'm missing from

selling marijuana.  I just want to let you know that this will

1    never happen again.  I learned my lesson.  Just from seeing

2    everything I'm missing I'll never risk my freedom again.

3    That's all I want to say.

4              THE COURT:  All right.  I'd like to take maybe five

5    minutes to just think about what has been said today, collect

6    my thoughts and then I'm going to come back and at that time

7    I'll recite the sentence I intend to impose and explain my

8    reasons and then go forward with sentencing.  So about five

9    minutes, if it's all right with you.  Thanks.

10             (Recess)

11             THE COURT:  All right.  Sentencing is a hard thing and

12   I spend a lot of time on it, and it's important to be

13   consistent and it's important to be thoughtful in how sentence

14   is arrived at.  And so one of the hallmarks in our system,

15   Mr. Basciano, is that judges have to give reasons and I think

16   that's a good thing.  I think it's helpful that the defendant,

17   the defendant's family, the public never has to wonder what was

18   going through the judge's mind.  That it's all public, that the

19   judge has an obligation to explain it.  That's what I tend to

20   do at these sentencings.  Sometimes it feels like I'm giving a

21   lecture, but it's not that, and it's certainly not a desire to

22   wag my finger at anybody.  It's just to explain what goes into

23   a sentence of this kind.  You're a human being with people who

24   care about you, good qualities, and your letter shows a

25   thoughtful person who has real talents and I think real

1    potential.  I believe that.

2          There are, of course, other aspects to the sentencing

3    that also have to be considered and that's the crime itself,

4    the notion of just punishment, the effect it may have on future

5    behavior and general deterrence.  So these are the things that

6    sort of come to mind in this case.  I see this as being --

7    marijuana I guess is a subject about which we're having a

8    national conversation I suppose but this is not a case that

9    involved medicinal marijuana or marriage being used for any

10   other purpose other than for people getting high illegally and

11   it was being done not for motives involving glaucoma but money,

12   it was all done in an illicit drug trade just to get money

13   through illegal means.  That's what it was.  In this case it

14   went on for a very long time.  It wasn't a one-shot thing.

15         We talked about Mr. Kokenyei who I gave 36 months to.

16   Mr. Kokenyei's role was to introduce people, to help a supplier

17   get together with somebody who wanted a supply but other than

18   an introduction it was in passing.  In this case according to

19   what's in the presentence report, your role was much more

20   active.  It began before you were in prison, it paused while

21   you were in prison and began again when you got out.  It was

22   something you did consistently.  It wasn't a one-shot, and I

23   think that that in terms of culpability that does make you more

24   culpable than some of the other defendants in this case.  Your

25   brother, Joseph, got a much lighter sentence than anybody

because it seemed to me that he was involved in a much less

serious way, almost as an afterthought and almost completely as

a result of who he was and who he was related to, and my sense

is that he sort of had been with a different family or been

living in a different place he would have bypassed this

altogether and I think the sentence has to reflect that.  But

you, according to what's in the presentence report, were a lot

more active in this thing and I think that goes to culpability.

        Valentine was another person I sentenced.  I mean, he

seemed more like you in the sense that he had a route, he was

responsible for distributing marijuana in this area from loafs

that he received from California.  I gave him 72 months to

reflect the fact that he had priors and reflect the fact that

what he was doing was pretty serious and over a long period of

time.  There's no magic to these guidelines.  They're largely

carried by the amounts of drugs involved.  They're criticized

for overly focusing on the amount and I think that's fair, but

I think the quantity often reflects culpability.  Larger

amounts of drugs usually makes you more culpable than a smaller

amount of drugs but other functions, other factors, the role in

the offense, not leadership versus minor participant, but just

driver versus distributor versus introducer, I think those are

the types of things that really aren't considered in the

guidelines.

        Duration in the offense is not really taken into

account by the guidelines.  Seems to me a person who was

involved for a very short period of time is less culpable

generally than a person who was involved for a long period of

time even though the amount is the same.  So in your case I

think it's the duration, it's the nature of the activity, the

fact that you were involved before and after a serious term of

imprisonment, that you should have recognized what you appear

to recognize now.  I think you should have recognized that at

the time you were getting out of jail in your previous term so

all of that persuades me a sentence below or even at the bottom

end of the range isn't appropriate.

          I think a sentence in this case of three and a half

years is right.  I'm not married to these guidelines.  I use

the guidelines for guidance, but ultimately I trust in my

judgment and my judgment in this is that a three-and-a-half

year term is appropriate particularly since you already served

a two year term and it didn't seem to do the trick.

          It's not to detract from what I said before.  I think

you're a decent guy.  There's a future for you, but there has

to be just punishment.  That's one of the factors I have to

consider.  So all things considered I think a sentence of 42

months is an appropriate sentence.  That's three-and-a-half

years, as I said.  I also will impose a term of supervised

release of three years.  I'm not going to impose a fine.

Forfeiture has been agreed to I think by the parties, is that

1    right, $600,000?

2              MS. MERMELSTEIN:  That's right, your Honor.

3              THE COURT:  And, Mr. Dratel, you had asked me to order

4    that the garnishment be the lowest possible.  I usually leave

5    that up to probation.  Usually I think it's 15 percent from the

6    gross income is the maximum they take out.  I think it

7    determines in large part whether and how much money

8    Mr. Basciano will be making in legitimate employment when he

9    gets out.  So did you have something else in mind?

10             MR. DRATEL:  Just to direct probation to not take the

11   maximum amount.  I mean, it's an extraordinarily onerous

12   penalty.

13             THE COURT:  It can be.  It sort of depends on how much

14   income a person has coming in.  So let's leave it as this:  If

15   when Mr. Basciano gets out the forfeiture payments are

16   perceived as high I'm certainly willing to revisit that.  So

17   you can take it up with probation in the first instance to say

18   it could be lower and if they disagree you can send me a letter

19   and I'll reconsider.  I'm not looking to bury or handicap

20   Mr. Basciano because he's looking to get his life back

21   together.  No one would do that.  I think people may disagree

22   on what's the appropriate amount and ultimately I get to make

23   those decisions.  So I will hear you, but I think really at

24   this point I'm ordering forfeiture in the amount of $600,000.

25             I'm not going to impose a fine, as I said.  I will

E8TFBASS                              Sentence

1    order a special assessment of $100 and ask you to pay

2    immediately, Mr. Basciano and that's designed to help defray

3    the costs of prosecution, the court costs.  One hundred dollars

4    is not a whole lot.  That's a mandatory special assessment.

5             Is there any legal impediment to my imposing such a

6    sentence?

7             MS. MERMELSTEIN:  No, your Honor.

8             MR. DRATEL:  No, your Honor.

9             THE COURT:  Mr. Basciano, could I ask you to please

10   stand?  Mr. Basciano, having accepted your guilty plea back in

11   February, I now sentence you as follows:  I sentence you to a

12   term of incarceration of three-and-a-half years, 42 months,

13   with credit for the time you already served.  I will also

14   impose a term of supervised release of three years and will

15   include the following mandatory special conditions:  First, you

16   shouldn't commit another federal, state or local crime of any

17   kind.  You shall not possess illegal narcotics or use illegal

18   narcotics of any kind.  That includes prescription drugs for

19   which you don't have a prescription.  You may not possess a

20   firearm or destructive device of any kind.  If you are near a

21   gun, you've got to get out of town.  You've got to get far

22   away.  You can't possess a gun, period.  If you do it's a crime

23   and you'll be looking at serious penalties, but also it will be

24   a violation of your supervised release in this case and you

25   will be subject to being resentenced here for up to three years

E8TFBASS                         Sentence

1    for the violation of your supervised release.  I tell you that

2    just because I really want to press on you that you can't be

3    near guns at all.  I think you get that message.

4           You will be tested for drugs twice, at least twice;

5    once when you get out and shortly after that as the probation

6    department thinks appropriate.  So that will be part of your

7    supervised release.  You will also cooperate in the collection

8    of DNA as directed by the probation officer.

9           There are 13 standard conditions.  They apply to

10   virtually every case involving supervised release.  I will

11   apply those here.  In addition, there are special conditions I

12   want to impose.  They include, first of all, that you will

13   provide probation with access to any requested financial

14   information.  You will not incur new credit charges or open

15   additional lines of credit without the approval of the

16   probation officer.  This is to insure you are not getting over

17   your head financially which would put you in a situation where

18   you would be tempted to make bad decisions that could put you

19   back into trouble.  That's the reason for those conditions.

20          In addition to that you will also submit your person,

21   your residence, place of business, your vehicle or any other

22   premises that you control, they will be subject to a search in

23   the event the probation officer believes there's some evidence

24   of a crime or evidence of a violation of supervised release.

25   That search will have to be done in a reasonable way at a

E8TFBASS                        Sentence

 1    reasonable time, but you will not have the ability to just say,

 2    "No, thanks, I don't want to do this."  If you refuse or

 3    otherwise obstruct the search that would be a violation of your

 4    supervised release.  One other thing I want to be sure you

 5    understand, to the extent that you share premises with someone,

 6    you have a girlfriend who obviously you're planning a future

 7    with, you have to let her know her things as well will be

 8    subject to a search merely due to the fact that she's living

 9    with you and sharing a premises with you.  So you have to let

10    her or anyone else with whom you share a premises, you have to

11    let them know that.

12            You will be supervised in the office of your

13    residence.  You're planning to live in the Southern District, I

14    think, right here in the Bronx or nearby, so you'll be

15    supervised in this district.  I'm going to ask you to report to

16    the nearest probation office within 24 hours from your release

17    of custody.  So the day you come out you'll come home,

18    celebrate.  That will be a nice day.  It will be a happy day.

19    But the very next day I want you to go to probation to get your

20    supervision lined up unless the next day is a holiday or a

21    weekend, then on the next business day.  Okay?  All right.  As

22    I said, I'm not going to impose a fine.  I will order

23    forfeiture in the amount of $600,000 pursuant to the agreement

24    of the parties and I will order the $100 special assessment.

25    Now, are there open counts?

1          MS. MERMELSTEIN:  There's an underlying indictment

2   which the government moves to dismiss.

3          THE COURT:  So I dismiss the open counts of the

4   underlying indictment.

5          I should tell you, Mr. Basciano, you have the right to

6   appeal this sentence to the extent you haven't already waived

7   that right.  I think you may have.  I think the way that the

8   agreement you entered into with the government was lined up it

9   says that if I sentenced you to 57 months or anything less than

10  57 months you agreed you won't appeal the sentence.  Since I

11  gave you 42 months I think you probably waived your right to

12  appeal.  But if you think you have a basis to appeal, talk to

13  Mr. Dratel.  You should file a notice of appeal within two

14  weeks.  Those deadlines are pretty strict so make sure you get

15  those in on time within two weeks.  Okay?  Mr. Dratel, are

16  there any recommendations you'd like me to make to Bureau of

17  Prisons?

18         MR. DRATEL:  Yes, your Honor, that Mr. Basciano be

19  located to a facility as close as possible to New York and the

20  Court recommend that he be enrolled in the BOP's substance

21  abuse program.

22         THE COURT:  I notice that in your letter now that you

23  raise it but it seemed to me in the presentence report it

24  sounded to me as if there really wasn't a drug problem here.

25         MR. DRATEL:  I think there's marijuana use and --

1        THE COURT:  It didn't seem that there was anything

2    other than that.  So what I'm referring to is paragraph 79.  It

3    says, "Defendant initially smoked marijuana at age 20 with

4    friends.  He used it a total of approximately ten times.  He

5    ceased smoking marijuana in 2011.  The defendant disclaimed the

6    use of any other type of illicit drugs or prescription

7    medications.  Began consuming alcohol at 21.  Drank once or

8    twice a month but not to excess."  So it doesn't seem to me

9    that there was any basis to think that there was a drug problem

10   here.  Is there more to the story that I'm missing?

11       MR. DRATEL:  No, your Honor, I just think that my

12   experience is that the use of illegal substances, it qualifies

13   the defendant for enrollment in these programs.

14       THE COURT:  Well, look, to the extent he qualifies,

15   that's certainly something the Bureau of Prisons can consider.

16   I'm not going to recommend one way or the other.  Usually I

17   make a recommendation in the case where someone has a

18   demonstrated abuse problem.  I don't see that here.  In fact,

19   almost to the contrary, so I will respectfully decline to make

20   that recommendation.  But I will recommend that he serve his

21   time in a facility near to his family as possible.  I can't

22   order that, but generally the Bureau of Prisons tries to

23   accommodate those recommendations, so I will recommend it in

24   the strongest terms.  This is a tough day for the defendant,

25   for the family.  I get that.  I think Mr. Basciano is a person

who seems to have learned his lesson.  His letter reflects

that.  So my hope is that, Mr. Basciano, that never again will

you be in a courtroom and the rest of your life is spent making

up to your family and yourself -- you don't deserve this.  This

is no way to live.  You should be out there living a life that

you and others can be proud of.  That's my hope for you.  When

you get out you will be supervised by a probation officer and

the probation officer is hoping for the best for you, as we all

are.  So let him provide that.  Probation can be helpful.  They

can help with job placement, with training opportunities.

Those are all things that you should employ.  Don't even wait

until you get out.  You could start today to make plans of how

you're going to make a living, and how you're going to live

that out in concrete fashion.

        So thanks to all who came here today, for your taking

the time to write letters, I appreciate that as well.  You may

be disappointed, you may have been hoping for a lower sentence,

I don't know.  I call them the way I see here.  But hopefully

you're sitting here and thinking the system was fair and was

thoughtful and wasn't mean spirited or petty in any way.  If

that was the case it would diminish everyone's respect for the

system and wouldn't be a good thing.

        All right, so thanks to the marshal and thanks to the

court reporter and I wish everybody a good day.

        (Adjourned)